

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

**FILED**
MAR 1 9 2001
Phil Lombardi, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| **OKLAHOMA CHAPTER OF THE AMERICAN ACADEMY OF PEDIATRICS (OKAAP); COMMUNITY ACTION PROJECT OF TULSA COUNTY, INC. (CAPTC);** K.M.W., by her mother and next friend Tracy T.; **J.L.O., E.H.C., M.A.P. and M.S.P.**, by their mother and next friend Lisa P; **C.A.T., K.P.T., and J.W.T.**, by their parents and next friends Rowena T. and Kevin T.; **C.A.S. and R.M.G.**, by their parents and next friends, Janice G. and Theodore G.; **J.W.H. and E.L.H.**, by their parents and next friends, Regina H. and Gus H.; and **S.M.**, by her mother and next friend, Heather R., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**CLASS ACTION COMPLAINT**

**01CV0187B (J)**

Plaintiffs,

vs.                                                    No.

**MICHAEL FOGARTY**, Chief Executive Officer of the Oklahoma Health Care Authority (OHCA);
**LYNN MITCHELL**, State Medicaid Director;
**CHARLES ED McFALL**, Chairman of the OHCA Board of Directors ;
**T.J. BRICKNER, JR.**, Vice-Chair of the OHCA Board of Directors;
**WAYNE HOFFMAN**, Member of the OHCA Board of Directors;
**JERRY HENLEE**, Member of the OHCA Board of Directors;
**RONALD ROUNDS, O.D.**, Member of the OHCA Board of Directors;
**GEORGE MILLER**, Member of the OHCA Board of Directors; and
**LYLE ROGGOW**, Member of the OHCA Board of Directors,

Defendants.



## CLASS ACTION COMPLAINT

## I. INTRODUCTION

1.      This is a civil rights action against responsible Oklahoma state officials arising out of their failure to provide children in Oklahoma who are enrolled in and/or eligible for federally-funded medical assistance (commonly known as Medicaid) with essential medical, dental, developmental, mental and behavioral health, and rehabilitation services.  Federal funding for children's health care is available under the Social Security Act of the United States ("Title XIX"), 42 U.S.C. § 1396, and the State Children's Health Insurance Program ("S-CHIP"), Title XXI, 42 U.S.C. § 1397aa.  While eligibility and levels of funding under Title XIX and S-CHIP are distinct, Oklahoma chose to provide services to S-CHIP eligible children under its Title XIX program.  As a result, children eligible for S-CHIP received Title XIX benefits.  The state of Oklahoma is required by law to provide all children eligible for federal medical assistance Early and Periodic Screening, Diagnosis and Treatment Services ("EPSDT") as set forth in Title XIX.  For purposes of this complaint, "Medical Assistance" is used and refers to Title XIX and required EPSDT services.

2.      This case is brought on behalf of the more than 327,768 children who are enrolled[1] and the estimated 120,000[2] children living in Oklahoma who are eligible but not

---

[1]      HCFA-416, Annual Early and Periodic Screening Diagnostic for federal fiscal year ending Sept. 30, 1999, reporting unduplicated enrollment of 327,768 children, filed by Oklahoma Health Care Authority 5/26/00.

[2]      Kaiser Commission 11/29/00; *see also*, Oklahoma Department of Human Services Statistical Bulletin, July 2000, reporting enrollment of approximately 71% of the

Class Action Complaint _____ Page 3

yet enrolled in Oklahoma's Medical Assistance program, by the Oklahoma Chapter of the American Academy of Pediatrics ("OKAAP"), by the Community Action Project of Tulsa County ("CAPTC"), and by the named plaintiff children and their families.  Plaintiffs seek declaratory and injunctive relief to stop the systematic violation of federal law taking place in Oklahoma which denies children delivery of prompt, complete and continuing health care.

    3.    The defendants are officials of the Oklahoma Health Care Authority ("OHCA"), which is the designated agency responsible for implementing and administering federally subsidized health care programs, including Medical Assistance to eligible children. In 1995, OHCA began transitioning its Title XIX program from a traditional fee-for-service arrangement to managed care arrangements with capitated payments.  OHCA developed two managed care delivery systems for its Medical Assistance program for children -- SoonerCare Plus and SoonerCare Choice.  Under the SoonerCare Plus program, OHCA contracts directly with Health Maintenance Organizations (HMOs) to provide EPSDT services to children who reside in Tulsa, Oklahoma City and Lawton and surrounding counties.  There are currently only three HMOs continuing to contract with the OHCA to provide these services -- Community Care, Heartland, and Unicare.  The SoonerCare Choice program serves the remainder of the counties.[3]  For children in the SoonerCare Choice

_____

children in Oklahoma eligible for Title XIX benefits.

    [3]    Some children, because of categorical eligibility, are not included in either SoonerCare program and continue to receive Medical Assistance services under a fee-for-service arrangement.

program, OHCA contracts with primary care physicians, including pediatricians, on a capitated payment basis, to provide basic health care. All other necessary health care services needed by children in the SoonerCare Choice program are paid by OHCA on a fee-for-service basis. While states have flexibility in designing their delivery system, OHCA and its officials remain responsible for ensuring all EPSDT services provided to eligible children.

4.      As a result of the acts and omissions of defendants, eligible children are not receiving EPSDT benefits and do not have equal access to medical services required by federal law. For example, in 1999, sixty-seven percent (67%) of the children for whom at least one comprehensive medical examination was required under Title XIX received **none** at all, and only ten percent (10%) of the children required to be furnished dental assessments and preventive dental care received **any**. The percentage of pediatricians participating in Oklahoma's Medical Assistance program is one of the lowest in the nation. Because of low payments to physicians and the administrative burdens and expenses associated with treating children covered by Oklahoma's Medical Assistance program, pediatricians, pediatric subspecialists and specialty care physicians are not available to provide needed care and required services. The failure of Oklahoma officials to comply with federal law results in the needless infliction of pain, the endangerment of young lives, the preemption of learning, development and growth, and the stunting of children's life chances.

5.      Specifically, this action requests the Court enter orders:

A.      Enjoining defendant state officials from depriving children of timely, complete and continuing health care and services in violation of Title XIX of the Social

Security Act, its implementing federal regulations and guidelines. 42 U.S.C. § 1396 *et seq.*

B.       Requiring the defendants to ensure payments to providers, including pediatricians, pediatric subspecialists, and other specialty care physicians, are sufficient to ensure children receiving Medical Assistance have access to care and services at least to the same extent that such care and services are available to other children in the geographic area as required by 42 U.S.C. § 1396a(a)(30)(A);

C.       Requiring defendants to design, implement, ensure, and enforce managed care arrangements which deliver in a prompt and continuing fashion, the full array of children's health care services required to be delivered by Title XIX; and

D.       Requiring defendants to bring children's health care to the children, including: aggressively informing children and their families of Oklahoma's obligation to promptly furnish complete and continuing children's health care; fully utilizing cooperative arrangements with other child-intensive agencies in order to effectively achieve enrollment and easy re-enrollment of all eligible children and also in order to accomplish the actual delivery of necessary health care and services to all enrolled children; and providing scheduling assistance, transportation, outstations and case-management.

## II. JURISDICTION AND VENUE

6.       Plaintiffs bring this action to redress the deprivation of rights secured them under the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, which is enforceable under 42 U.S.C. § 1983.

7.       This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which

confers on the federal district courts original jurisdiction over all civil suits arising under the Constitution and laws of the United States, and 28 U.S.C. § 1343(a)(3) and (4), which confers on the federal district courts original jurisdiction over all claims asserted under 42 U.S.C. § 1983 to redress any deprivation, under color of state law, of rights, privileges, and immunities guaranteed by the Constitution of the United States and the acts of Congress.

8.    Plaintiffs' request for declaratory and injunctive relief, and for other appropriate equitable relief, is authorized by 28 U.S.C. §§ 2201-02, 42 U.S.C. § 1983, 28 U.S.C. § 1331, and Fed. R. Civ. P. 57 and 65.

9.    Venue is proper in the Northern District of Oklahoma under 28 U.S.C. § 1391(b).

## III. PARTIES

### A. PLAINTIFFS

10.    The **Oklahoma Chapter of the American Academy of Pediatrics (OKAAP)** is a non-profit professional organization of pediatricians and pediatric specialists whose purpose is to foster improvements in the health and welfare of infants, children and adolescents in the State of Oklahoma and to further the goals and purposes of the American Academy of Pediatrics, namely: "as our most enduring and vulnerable legacy, the children of Oklahoma deserve optimum health and require the highest quality health care."

a.    The OKAAP, with in excess of 300 members, exists:  to advocate for infants, children, adolescents and young adults and provide for their care; to collaborate to assure child health; and to ensure that decision-making affecting the health and well-being

of children and their families is based upon the needs of those children and families.

b.    In providing treatment to children receiving Medical Assistance, members of the OKAAP are faced with rates which fail to cover costs and with administrative burdens and impediments which are barriers to children receiving needed care. For example, on a monthly basis, the OHCA computer system tracks eligible children, by geography, age and available doctors, to make "matches." While a patient's preference for physician choice is supposed to be honored, the computer often fails to do so. As a result, children are randomly and frequently reassigned to new physicians, and families are not notified. Children and parents arrive at their doctor's office for appointments and discover the child's primary care physician has been changed and SoonerCare will not pay for needed treatment. These "misassignments" delay services and destroy continuity of care for the children. The bureaucratic hassles associated with treating children receiving Medical Assistance are unending, increase costs, and delay care. As an example, minor procedures, such as toe nail, mole or wart removals, require preapproval by the OHCA. These procedures are paid at rates of $23-32. Nonetheless, OHCA has advised pediatricians that a letter, preferably including a picture, must be sent for approval by OHCA staff. The costs to secure approvals for covered treatments often exceed the reimbursement rates and always increase the workload of office staff and overhead.

c.    The Chapter itself has expended and continues to expend sizable organizational resources seeking to bring Title XIX pediatric payments to their statutory level and to secure timely, complete and continuing health care for the estimated 120,000 children

Class Action Complaint _____ Page 8

eligible for these services but not enrolled in the program and the additional 238,000 children enrolled under Title XIX and S-CHIP. If defendants had not unlawfully denied those objectives, the organization could and would devote these considerable resources fully to other purposes such as the advancement of child safety, school learning, public health measures against smoking, drinking and drugs, against violence, cross-professional collaboration, and pediatric education.

        d.      The Oklahoma Chapter of the Academy of Pediatrics sues for itself and as representative of its member physicians, and, as professionals who have fiduciary duties to the children who are their patients. They sue also as representative of the children who are enrolled in or are eligible for children's health care under Title XIX and S-CHIP. As such, the Chapter has standing under *Havens Realty Co. v. Levine*, 455 U.S. 363, 365 (1982), to bring the action. The Chapter also has standing, both as representative of its members and as representative of the children it serves professionally, under *Wilder v. Virginia Hosp. Ass'n.,* 496 U.S. 498, 509 (1990); *Arkansas Medical Society v. Reynolds,* 6 F.3d 519, 528 (8th Cir. 1993); and *West Virginia Hosp. Ass'n. v. Casey,* 885 F.2d 11, 20 (3d Cir. 1989).

      11.      The **Community Action Project of Tulsa County, Inc. (CAPTC)** is a non-profit organization located in Tulsa, Tulsa County, Oklahoma, whose purpose is to help individuals and families in economic need achieve self-sufficiency in an atmosphere of respect. CAPTC operates a comprehensive set of programs in areas such as emergency aid, medical care, housing, community development, employment, savings, and education.

        a.      One of the programs operated by CAPTC is the Head Start program for

Tulsa County. Currently, 1,152 children are served by CAPTC's Head Start program for school year 2000-01; 208 children ages 0-3 participate in the First Start program and 135 children are served in CAPTC's before and after school programs. As a Head Start agency, CAPTC has the obligation to ensure all children in its Head Start programs receive essential medical, dental, developmental, mental health, and rehabilitation services.

b.    Children eligible for Title XIX services are assisted in enrolling and accessing Medical Assistance. However, CAPTC's responsibility to ensure Head Start children actually receive needed diagnosis, treatment and care is nondelegable. Because Oklahoma's Medical Assistance program fails to provide access to needed specialty care, CAPTC has and will continue to expend agency funds to pay for EPSDT services needed by its children who are enrolled in Title XIX but who are not receiving required care because of the lack of providers available for children receiving Medical Assistance. At least 90% of the children served by CAPTC's Head Start program are financially eligible for Medical Assistance.

c.    In accordance with its legislative mandate under Oklahoma law, CAPTC serves as a "primary advocate for reduction of the causes, conditions and effects of poverty and shall provide social and economic opportunities."

d.    The Community Action Program of Tulsa County, Inc., sues for itself and on behalf of the children it serves who are now or will be enrolled in its Head Start programs and eligible for Medical Assistance.

12.    **K.M.W.** -- K.M.W., a minor, is the daughter of Tracy T., who appears in this

matter as the next friend of K.M.W. They reside in the city of Catoosa, Rogers County, State

of Oklahoma. K.M.W. was born September 20, 1989 with spina bifida and a club foot. She

also suffers from migraine headaches. As a result of her disabilities associated with spina

bifida, K.M.W. is categorically eligible for medical services pursuant to Title XIX of the

Social Security Act. When K.M.W. was four years old, she was admitted to Children's

Hospital in Oklahoma City where she received a spinal cord release and corrective surgery

on her foot. Since that corrective surgery, K.M.W. has suffered from serious and repeated

infections of her foot.

      a.     In June 1999, Tracy T. was told she had to choose an HMO to provide

medical services to her daughter or one would be chosen for her. She decided not to make

the choice and was assigned to Heartland.

      b.     As a result of her health conditions, K.M.W. requires the services of a

pediatric neurologist as well as other specialists. In Tulsa, there are four physicians who list

pediatric neurology as their specialty. None of these physicians are available to children who

have Heartland as a managed care provider. One pediatric neurologist in Oklahoma City is

"available" to see Heartland patients--appointments for children receiving Medical

Assistance through Heartland are limited to one afternoon a month. Of the four Tulsa

pediatric neurologists, only one will accept any patients who depend on Medical Assistance,

and he has limited his practice for these patients to two afternoons a week. Due to the lack

of specialists who will accept the low payments of the SoonerCare program or direct

payments by OHCA, K.M.W. must travel to Oklahoma City to receive needed specialty

medical services.

        c.      The administrative burdens of the SoonerCare HMO make receiving timely care, at best, difficult and, at worst, impossible. Before seeing any specialist, K.M.W. must be referred to a specialist by her primary care physician. Heartland must then approve the referral and assign a treatment number before an appointment can even be scheduled. In order to expedite this process, K.M.W.'s mother has frequently found it necessary to personally take on the process of securing a referral number from Heartland. With diligent effort, including repeated calls to the HMO, this process can take days and even weeks, thereby delaying urgently needed treatment. Even when the referral number is received, the process is so cumbersome that treatment can still be denied. For example, after receiving a referral number, K.M.W. and her mother made an appointment with a pediatric orthopedist in Oklahoma City. Upon traveling to Oklahoma City, they were told that the doctor had not received the referral number directly from Heartland and until it was received by the physician directly from the SoonerCare HMO, the doctor could not see K.M.W. In order to secure the urgently needed services, K.M.W. left the doctor's offices and went to the emergency room at Children's Hospital where, after waiting hours, they were finally seen by a physician and the needed specialist was called.

        d.      During the Summer of 2000, the infection in K.M.W.'s foot became increasingly worse. Her primary care physician prescribed oral antibiotics for six weeks. When that treatment did not cure the infection, she was admitted to Tulsa Regional Medical Center where intravenous antibiotics were administered. When the intravenous antibiotics

proved unsuccessful, it became clear that her big toe would need to be amputated. Working with Heartland and the OHCA, an orthopedic surgeon was secured to perform the operation. At 6:00 a.m., on the morning of the scheduled surgery, when the surgeon discovered how little he would be paid for doing the surgery, he refused to do the procedure. The surgery was delayed and K.M.W. had to be moved to Hillcrest Hospital where a surgeon agreed to provide the needed care. As of the filing of this complaint, there are no orthopedic surgeons in northeastern Oklahoma available to children receiving services through the SoonerCare Plus HMO, Heartland.

     e.     The delays in treatment caused by the failure of the OHCA to insure that K.M.W. receives timely and appropriate access to medical care has contributed to her medical condition growing worse. Inadequate access to needed specialty care has caused this plaintiff unnecessary and avoidable pain, delayed the treatment of infections requiring immediate attention, and places K.M.W. at risk of unnecessary pain and suffering and harm in the future.

     13.    **J.L.O., E.H.C., M.A.P. and M.S.P.** -- J.L.O., E.H.C., M.A.P., and M.S.P. are minor children of Lisa P., who appears in this matter as their next friend. They reside in the town of Coyle, Logan County, State of Oklahoma. J.L.O. is a male born May 14, 1984. E.H.C. is a male born October 8, 1993. M.A.P. is a female born September 17, 1997. M.S.P. is a male born May 10, 1999.

     a.     M.S.P. was born with renal disease which requires daily dialysis. Due to the nature of his disease, in addition to being entitled to Medical Assistance under Title

XIX, he is also eligible for Medicare. M.S.P. and his sister M.A.P. also have private insurance through their father, who resides in Arizona. The other minor children of Lisa P. depend on Medical Assistance for all their medical care.

b.    Lisa P. and her children moved from Arizona to live with her parents in rural Payne County in May 2000. When she enrolled her children for Medical Assistance, they were initially assigned to a physician in the town of Guthrie in Logan County. She requested that their primary care physician be designated as a pediatrician at the Warren Clinic in Stillwater, Oklahoma. This change was eventually made.

c.    In October 2000, Lisa P. and her children moved two and a half miles to a house in Coyle, Oklahoma. After the move, when she took M.S.P. to the Warren Clinic for blood work to determine the effectiveness of his dialysis, Lisa P. was informed, for the first time, that the Oklahoma Health Care Authority would no longer pay for her children to be treated at the Warren Clinic in Stillwater. Due to the critical needs of the child, the Warren Clinic provided the needed tests. Because she had moved across the county line from Payne County into Logan County, her children were assigned a new physician, located in Oklahoma County, to serve as their primary care physician.

d.    When Lisa P. protested this new assignment because she and her children had an existing doctor-patient relationship with the pediatricians at Warren Clinic and she had no relationship with the new Oklahoma County physician, she was told there was nothing she could do to maintain the relationship with the Warren Clinic pediatricians. Her only choices were physicians outside of Payne County.

Class Action Complaint                                                            Page 14

e.      Following OHCA's disruption of her children's medical provider, Lisa

P. was informed that because M.S.P. was covered by Medicare, based upon his renal

condition, he could continue to be treated by the pediatricians in Stillwater. Due solely to

the fact that Lisa and her children moved two and a half miles, her other children now have

a physician in Logan County.

14.     **C.A.T., K.P.T., and J.W.T.** -- C.A.T., K.P.T., and J.W.T. are minor children

of Rowena T. and Kevin T., who appear in this matter as their next friends. They reside in

the town of Chandler, Lincoln County, State of Oklahoma. C.A.T. is a female born July 2,

1983. K.P.T. is a female born June 23, 1995. J.W.T. is a male born July 29, 1998.

a.      Until the birth of J.W.T., these plaintiffs resided in Stillwater,

Oklahoma, and used the pediatricians at Warren Clinic as their primary care physicians. In

July 1998, they moved to Chandler for the father's employment and retained the pediatricians

at Warren Clinic as their primary care physicians. In January 2001, they received notice that

they had to choose a SoonerCare Plus HMO. When they inquired about retaining the

physicians at Warren Clinic as their primary care providers, they were informed that because

they lived in Lincoln County, they no longer had access to the Warren Clinic pediatricians

in Payne County.

b.      The three children of this family were then assigned to three different

primary care physicians, none of whom are pediatricians. J.W.T. and K.P.T. were assigned

to two different doctors in Oklahoma City, both of whom are in training programs at the

University of Oklahoma Medical School, one as an occupational medicine fellow and the

other as a sports medicine fellow. Both of the assigned doctors have full-time obligations with their training programs and have as little as one or two half days a week available to see their assigned SoonerCare Plus patients. C.A.T. was assigned a physician in the town of Davenport, Oklahoma.

c.    In February, K.P.T. developed symptoms which turned out to be pneumonia. On Friday afternoon, the assigned doctor's office was called, and Rowena T. was told K.P.T.'s assigned physician was no longer with the clinic and a doctor could not see her either that day or Saturday. K.P.T.'s mother was lectured about having allegedly waited until the last minute to call and then was told her only option was to take K.P.T. to the emergency room. Pursuant to the requirements of the SoonerCare Plus plan, Rowena T. then called the HMO. Rowena was told even though her assigned doctor was unavailable to provide care, SoonerCare would not pay for her daughter to be treated by the Stillwater pediatricians. Her son J.W.T. was also feeling ill. In order to ensure that their children got appropriate care, the parents took K.P.T. and J.W.T. to the Warren Clinic in Stillwater. Because they resided in Lincoln County, part of the SoonerCare Plus managed care program as of January 1, 2001, the medical care and prescriptions needed by the children were not paid for by Heartland; the parents paid for this needed medical care.

d.    On February 13, 2001, while C.A.T. was with family friends in Payne County, she developed a severe pain in her side, a fever and was nauseated. At approximately 10:30 p.m., she called her mother and reported that she was feeling ill. Her mother suspected it was an appendicitis attack and that her daughter needed to go to the

hospital. Rowena T. called the HMO and proceeded through the required process. During the next 30-45 minutes, there were a series of calls between Rowena T. and her daughter and nurses for the HMO. They spoke with at least three different nurses, at least one of whom was in Ohio. It was agreed C.A.T. needed to go to a hospital immediately, but the family was also instructed that she was not go to the hospital in Stillwater which was only fifteen minutes away. If she went to the Stillwater hospital, the family was warned that they would have to pay all of the hospital costs. In order to get their children the medical care they needed, these parents had previously paid for that care when Heartland had refused. In this instance, however, they feared that the cost of the hospital care would far exceed their resources. Due to these harsh financial realities, in spite of the fact that it was a very foggy night and dangerous to drive far, and in spite of the fact that C.A.T. was in severe pain and not in condition for a long drive, the family was forced to arrange for friends to drive their daughter to the family's home in Chandler. The family then drove her to the hospital in Shawnee, Oklahoma. As a result of the HMO's lack of providers and the design of OHCA's SoonerCare programs, it took three and a half hours from the time Rowena T. recognized her daughter needed emergency care until she arrived at a hospital where she could receive treatment. At the Shawnee hospital, it was determined that C.A.T. was having an appendicitis attack and immediate surgery was required.

15.    **C.A.S. and R.M.G.** -- C.A.S. and R.M.G. are minor children who appear in this matter by their parents and next friends, Janice G. and Theodore G. They reside in the town of Sapulpa, Creek County, State of Oklahoma. C.A.S. is a male born July 10, 1984.

R.M.G. is a male born May 22, 1985.

     a.    R.M.G. is an adopted child with identified special needs and receives Medical Assistance through a fee-for-service arrangement rather than through the Oklahoma Health Care Authority's SoonerCare managed care programs. R.M.G., and the rest of the family, had a family physician until a year ago, when the physician ceased treating any patients receiving Medical Assistance. Since that time, R.M.G. has not had a primary care physician. Two years ago, the dentist who had treated R.M.G. similarly ceased providing care to patients covered by Title XIX. As a result, R.M.G. lost dental services. He does not at this time have either a primary care physician or a dentist.

     b.    C.A.S. was provided medical services during a period of approximately eighteen months while in State custody. During that time, he received psychiatric care, including prescription medication for a psychiatric illness. Upon his discharge, due to the lack of physicians who will provide services to children receiving Medical Assistance, his family could not find either a primary care physician or a psychiatrist who would agree to see him or continue his psychiatric medication. It took the family over a month to find a primary care physician who was willing to provide a prescription for the medications needed to continue his treatment until he could see a psychiatrist.

     16.    **J.W.H. and E.L.H.** -- J.W.H. and E.L.H. are the minor children of Gus H. and Regina H. who appear in this matter as their next best friend. They reside in the town of Ada, Pontotoc County, State of Oklahoma. J.W.H. is a male child born August 5, 1996. E.L.H. is a male child born June 29, 1993.

Class Action Complaint                                                    Page 18

a.      Pontotoc County, where these plaintiffs reside, has a number of pediatricians who specialize in the care and treatment of children, none of whom participate in OHCA's SoonerCare Choice program as a matter of course. Both J.W.H. and E.L.H. depend on SoonerCare Choice to meet their medical needs.

b.      J.W.H. was born prematurely and has suffered from several serious conditions since birth. These include bronchopulmonary dysplasia, a complication of premature birth. Due to the complications surrounding his birth, Dr. Ramadan, a pediatrician, was called to the Ada hospital to attend the birth of J.W.H. Dr. Ramadan rendered needed care to J.W.H. and referred him to University Hospital in Oklahoma City, where J.W.H. was hospitalized for the next twenty-eight days. Upon his discharge from University Hospital, J.W.H. was transferred back to the Ada hospital where he remained for another one and a half months. Before his discharge, J.W.H.'s parents attempted to find a pediatrician to treat their infant son upon discharge. After contacting all the pediatricians in Pontotoc County and being told that none would accept patients covered by SoonerCare Choice, the parents called Dr. Ramadan. He informed them that he had continued to be interested in their child's care and had continued to follow J.W.H.'s progress during his hospitalization. Based upon the personal request of the parents and the complicated medical needs of J.W.H., he agreed to accept him as a patient if J.W.H.'s assigned SoonerCare Choice primary care physician would refer him. J.W.H. was referred and Dr. Ramadan has continued to treat J.W.H. Periodically, these referrals must be renewed; the continued treatment of J.W.H. by Dr. Ramadan is subject to the discretion of J.W.H.'s designated

primary care physician.

    c.    Dr. Ramadan decided not to participate in the SoonerCare program after a meeting of several Pontotoc County physicians with the then C.E.O. of OHCA, Garth Splinter. At that meeting, the physicians were told that if they participated in the program they would receive a capitated fee for every patient on their case load. They were also informed that they would receive this fee even if they did not see those patients, and thereby the program could prove profitable to the participating physicians. When Dr. Ramadan expressed concern that it was not ethical to have patients whom the physician did not see, the OHCA Medical Director told him that the SoonerCare Program was not for him. Dr. Ramadan concluded that the OHCA official was correct, and he has not participated in the SoonerCare program, accepting only a few children, such as J.W.H., on referrals from other physicians, or on a charity basis where he charges no fee for the medical services rendered.

    d.    These parents have also sought to secure a pediatrician for E.L.H. In addition to experiencing the medical needs common to children, E.L.H. also suffers from asthma, allergies and severe headaches which are believed to be associated with the allergies. The serious nature of these needs has prompted these parents to seek a pediatrician to care for E.L.H. For the same reasons that the parents were unable to secure a pediatrician to be the primary care physician for his brother, they have been unable to secure one for E.L.H. Due to their experience with having E.L.H. treated by physicians lacking specific training in caring for children, when E.L.H. needs care for anything other than the most routine matters, the parents take him to a pediatrician and pay for it out of their own pocket.

17.    **S.M.** – S.M. is the five-year-old daughter of Heather R., who appears in this matter as S.M.'s next friend.  They reside in the city of Tulsa, Tulsa County, State of Oklahoma.  S.M. is a female born November 20, 1995.

a.    A year ago, S.M.'s mother began noticing what she now knows to have been seizures.  For her primary care, S.M. accessed two clinics, seeing different physicians.  None of the physicians at either clinic diagnosed the seizures.  Her seizure activity grew worse until the seizures progressed to where S.M. was experiencing as many as seven seizures each day.  At this point she saw a pediatrician who diagnosed the seizures and prescribed medication in an effort to control them.  The medication did not achieve that goal and it was determined that S.M. needed to see a pediatric neurologist.  There are no pediatric neurologists in Tulsa available to see new patients covered by the SoonerCare Plus program.  A pediatric neurologist in Oklahoma City was identified as a possible provider, but when the neurologist was contacted, the office advised there was a waiting list with 170 other medical assistance children in front of S.M..  No appointments were being scheduled until late April and would then be available only on a cancellation basis.

b.    S.M. participates in the Head Start Program operated by CAPTC.  Pursuant to its mandate to assure medical care for the children in its program, CAPTC agreed to pay for her to see a neurologist.  Since CAPTC payments are not limited to Medical Assistance rates, S.M. was able to get an appointment with a pediatric neurologist in Tulsa.  She now has appointments on March 28, 2001, and April 2, 2001, for a consult and possible EEG and MRI studies.

## B. DEFENDANTS

18.     **Michael Fogarty** is the Chief Executive Officer of the Oklahoma Health Care Authority.  Since January 1995, the Oklahoma Health Care Authority (OHCA) has been the single designated state Medicaid agency.  As its Chief Executive Officer, Defendant Fogarty has the ultimate nondelegable duty to assure that Oklahoma's Medical Assistance program is implemented and administered consistent with the requirements of the federal law, including Title XIX.  Defendant Fogarty is sued in his official capacity.

19.     **Lynn Mitchell, M.D., M.Ph.**, the State Medicaid Director, is responsible for implementing the State's Medical Assistance Plan, including Oklahoma's Managed Care § 1115(a) waiver authorizing SoonerCare Choice and SoonerCare Plus.  As the Director, Defendant Mitchell is responsible for contracting for services, monitoring programs and ensuring compliance with federal law.  Defendant Lynn Mitchell is sued in her official capacity.

20.     The **Oklahoma Health Care Authority Board** is responsible for establishing policies of the agency as well as adopting and promulgating the rules necessary to carry out the duties and responsibilities of OHCA.

        A.      **Charles Ed McFall** is chairman of the Oklahoma Health Care Authority Board of Directors.  Defendant McFall is sued in his official capacity.

        B.      **T.J. Brickner, Jr.**, is a resident of Tulsa County and Vice-Chair of the Oklahoma Health Care Authority Board of Directors.  Defendant Brickner is sued in his official capacity.

C.    **Wayne Hoffman** is a member of the Oklahoma Health Care Authority Board of Directors.  Defendant Hoffman is sued in his official capacity.

D.    **Jerry Henlee** is a member of the Oklahoma Health Care Authority Board of Directors.  Defendant Henlee is sued in his official capacity.

E.    **Ronald Rounds, O.D.**, is a member of the Oklahoma Health Care Authority Board of Directors.  Defendant Rounds is sued in his official capacity.

F.    **George Miller** is a member of the Oklahoma Health Care Authority Board of Directors.  Defendant Miller is sued in his official capacity.

G.    **Lyle Roggow** is a member of the Oklahoma Health Care Authority Board of Directors.  Defendant Roggow is sued in his official capacity.

## IV.  CLASS ACTION ALLEGATIONS

21.    The named plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b)(2).  Plaintiffs' class consists of children under the age of 21 who are now, or in the future will be, residing in Oklahoma and who are, or will be, eligible for Medical Assistance's Early and Periodic Screening, Diagnosis, and Treatment Services ("EPSDT Services").

22.    The requirements of Fed. R. Civ. P. 23(a) are met in that the class is so numerous that enjoining all members is impractical.  In 1997, the Oklahoma Health Care Authority estimated that 47% of all children in the State of Oklahoma, approximately 400,000, are eligible for Medical Assistance under Title XIX and S-CHIP.  In July 2000, the Department of Human Services, the state agency responsible for determining eligibility,

Class Action Complaint _____ Page 23

estimated that 29% of the eligible children in Oklahoma are not enrolled.

23.    The named plaintiffs raise claims based on questions of law and fact that are common to the class. Plaintiffs and the class members rely on defendants to ensure that they have access to and receive the health care services guaranteed them under federal law. Plaintiffs and the class members are being deprived of these services because of systemic deficiencies in Oklahoma's Medical Assistance program, for which defendants are responsible. Questions of fact common to the entire class include:

A.    Defendants' failure to ensure that payments are sufficient to ensure providers, including pediatricians and specialty providers, are available to provide appropriate screening, diagnosis and treatment for children with Medical Assistance benefits, including, but not limited to, medical (including mental and behavioral health), vision, hearing, dental, and developmental screening and diagnosis at appropriate intervals that meet reasonable standards of medical practice, and the prompt delivery of all needed treatment;

B.    Defendants' failure or refusal to develop and implement a coordinated system of care that provides class members with medical, vision, hearing, dental, and developmental screening, diagnosis and treatment, at appropriate intervals that meet reasonable standards of medical care; and

C.    Defendants' failure to ensure that families of children enrolled in Medical Assistance are adequately informed of their children's right to receive EPSDT services and of how to obtain such services and that they receive them.

24.    Questions of law common to the entire class include whether defendants' acts

and omissions deprive plaintiffs of EPSDT services in violation of the Medicaid Act, 42

U.S.C. § 1396a, 1396d(a), and 1396d(r), 1396u-2, and regulations and guidelines promul-

gated pursuant thereto. Specifically, this action requests the Court enter orders:

   A. Enjoining defendant state officials from depriving children of timely,

complete and continuing health care and services in violation of Title XIX of the Social

Security Act, its implementing federal regulations and guidelines. 42 U.S.C. § 1396a *et seq.*

   B. Requiring the defendants to ensure payments to providers, including

pediatricians, pediatric subspecialists, and other specialty care physicians, are sufficient to

ensure children receiving Medical Assistance have access to care and services at least to the

same extent that such care and services are available to other children in the geographic area

as required by 42 U.S.C. § 1396a(a)(30)(A) and that such payments are consistent with

efficiency, economy and quality of care;

   C. Requiring defendants to design, implement, ensure, and enforce

managed care arrangements which deliver in a prompt and continuing fashion, the full array

of children's health care services required to be delivered by Title XIX; and

   D. Requiring defendants to bring children's health care to the children,

including: aggressively informing children and their families of Oklahoma's obligation to

promptly furnish complete and continuing children's health care; fully utilizing cooperative

arrangements with other child-intensive agencies in order to effectively achieve enrollment

and easy re-enrollment of all eligible children and also in order to accomplish the actual

delivery of necessary health care and services to all enrolled children; and providing

scheduling assistance, transportation, outstations and case-management.

25.    The named plaintiffs will fairly and adequately protect the interests of the class. The named plaintiff organizations have the resources to prosecute this action on behalf of the proposed class. They are represented by attorneys employed by Bullock and Bullock and the Public Interest Law Center of Philadelphia. Counsel have experience in complex class action litigation involving health care and civil rights laws. Counsel have the resources, expertise, and experience to prosecute this action.

26.    Defendants' acts and omissions have affected and will affect the class generally, thereby making final injunctive relief and declaratory relief with respect to the class as a whole appropriate.

## IV.

## THE LAW AND STRUCTURE OF CHILDREN'S HEALTH CARE UNDER TITLE XIX OF THE SOCIAL SECURITY ACT

27.    The purpose of Title XIX is "to furnish (1) medical assistance on behalf of families with dependent children and . . . disabled individuals whose income and resources are insufficient to meet the costs of necessary medical services and (2) rehabilitation and other services to help such families and individuals allow and retain capability for independence or self-care." 42 U.S.C. § 1396.

28.    To enable the states to do so and in exchange for acceptance of the obligations imposed by Title XIX, the first section of Title XIX provides:

> There is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this

subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance.

*Ibid.*

29.    Title XIX of the Social Security Act has established a joint, cooperative federal-state program for furnishing and financing health care and services. Title XIX was first enacted in 1965. Its children's health care provisions were first made express in 1967. Its 1989 and 1990 Amendments significantly expanded family incomes at which children are eligible and the health care and services—primary and specialty alike—that must be furnished to all eligible children. Its 1997 Amendments expressly hold state officials responsible for securing the required performance from managed care organizations with whom they contract.

30.    Each state decides whether to participate in the Medical Assistance program. Oklahoma has chosen to participate. The Health Care Financing Agency (HCFA) in the United States Department of Health and Human Services oversees the program for the Secretary. Defendant Oklahoma officials are responsible under Title XIX and by designation of state law, 63 O.S. § 5005 *et seq.*, for implementation of the program in accordance with the requirements imposed by Title XIX, its regulations, 42 C.F.R. § 440.40(b), 441-50 *et seq.,* and policy directions such as HCFA's State Medicaid Manual.

31.    Participating states are reimbursed by the Health Care Financing Agency—without any financial cap—for the largest portion of their medical assistance

expenditures, in exchange for compliance with the requirements of Title XIX. In Oklahoma, the federal government pays 71.24% of expenditures for health care and services furnished under Title XIX; Oklahoma pays the remaining 28.76% of the expenditures. For designing, purchasing, and operating information systems, for training professional medical personnel and staff, for family planning services, and for quality assurance, the federal financial share is still higher, variously 75% and 90%. 42 U.S.C. § 1396(b). For the State Children's Health Insurance Program (S-CHIP), the federal match for Oklahoma is 79.87%.

32.    For children's health care and services, as for all medical assistance, Title XIX requires that "such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).

33.    Under Title XIX, children's health care is mandatory upon each participating state. Since 1967, at 42 U.S.C. § 1396d(a)(4)(B), Title XIX has explicitly provided that:

> The term 'medical assistance' means payment of part or all of the cost of the following care and services . . . [:] early and periodic screening, diagnostic, and treatment services (as defined in sub Section 1396d(r) of this section) for individuals who are eligible . . . and are under the age of 21.

At § 1396a(a)(10)(A), Title XIX provides that each participating state must "make available . . . at least the care and services listed in paragraph [4(B)] of section 1396d(a) to all individuals who are [eligible]." These and the above-stated provisions create an uncapped entitlement for all eligible children.

34.    The children's health care provisions of Title XIX were enacted in 1967 in part because of the integral relationship between child health and learning. The <u>Presidential</u>

Message to the Congress, February 8, 1967, proclaimed:

> We look toward the day when every child, no matter what his color or his family's means, gets the medical care he needs, starts school on an equal footing with his classmates, seeks as much education as he can absorb—in short, goes as far as his talents will take him.

The first goal of the Governors' National Education Goals (1990) is "Every child will start school [healthy and] ready to learn." For example, middle ear infections are the most frequent childhood illness. Untreated and recurrent, they interfere with the ability to process sounds and understand speech, delaying development of language and threatening the whole education process. Lisbeth B. Schorr, Within Our Reach at 86 (1989). Educator Theodore Sizer, in the course of his five-year study of high schools, noted one of the most striking class differences: "There are fewer spectacles on poor kids—and its not because their eyes are better." *Ibid.*; *see also* Horace Sizer's Compromise: The Dilemma of the American High School (1985). Dental caries are the most frequent childhood condition. Bleeding gums, impacted teeth, rotting teeth are routine matters for poor children, wearing down their stamina, defeating their ambitions. Children live for months with dental pain grown-ups would find unendurable. For them, it is a given, a "natural" part of life. The gradual attrition of accepted pain erodes their energy and aspirations. Jonathan Kozol, Savage Inequalities, Children in America's Schools at 20-21 & 138 (1991).

35.     Since 1989, at 42 U.S.C. § 1396d(r), Title XIX has set forth expressly what items and services the mandatory "early and periodic screening, diagnostic and treatment services" must include; namely:

1.    **Comprehensive screening examinations** at intervals "which meet reasonable standards of medical and dental practice, as determined by the State after consultation with recognized medical and dental organizations involved in child health care" and "at such other intervals, indicated as medically necessary, to determine the existence of physical or mental illnesses or conditions and which shall at a minimum include (i) a comprehensive health and developmental history (including assessment of both physical and mental health development), (ii) a comprehensive unclothed physical exam, (iii) appropriate immunizations . . . according to age and health history, (iv) laboratory tests (including lead blood level assessment according to age and health history), and (v) health education (including anticipatory guidance)."

2.    **Vision services** at intervals which meet reasonable standards of medical practice as determined by the State after consultation with recognized medical organizations involved in child health care and otherwise as medically necessary to determine the existence of a suspected illness or condition and "which shall at a minimum include diagnosis and treatment for defects in vision, including eyeglasses."

3.    **Dental services** at similar intervals determined after consultation with recognized dental organizations involved in children's health care and "which shall at a minimum include relief of pain and infections, restoration of teeth, and maintenance of dental health."

4.    **Hearing services** at similar intervals determined in similar ways and "which shall at a minimum include diagnosis and treatment for defects in hearing, including

hearing aids."

      5.    **All** such other **health care, diagnostic services, treatment, and other measures** described in § 1396a(a) necessary to **correct** or **ameliorate defects** and **physical** and **mental illnesses** and **conditions**, "whether or not such services are covered [otherwise] under the State plan."

      36.    In 1989, eligibility for children's health care and services was unhooked from income assistance (then called Aid to Families with Dependent Children; colloquially, "public assistance;" now called Temporary Aid to Needy Families). Eligibility criteria had become full of complexities and restrictively penurious (in most states, public assistance paid a small fraction of the poverty level). Instead, in 1989, Congress linked children's health care eligibility directly and simply to a child's age and his or her family's income. In doing so, Congress intended to, and did, expand the numbers of poor and near-poor children who are entitled to health care, particularly including those in working families whose jobs pay only low wages, right up into, for large families, near-median family income.

      37.    The 1989 Amendments required states to provide health care to children from birth through age five in families with income equal to or less than 133% of the poverty level and for children born after September 30, 1983 (now aged 17 and turning 18), 100% of the poverty level, and to age 21, the cash assistance standards. The 1989 Amendments authorized eligibility standards to 185% of the poverty level for infancy (birth to age one), and at all ages allowed the States, by waiver, to choose still higher eligibility standards, while maintaining the same proportion of federal financial participation. Oklahoma has chosen to

set income eligibility at 185% of the poverty level for all children, birth through 17.

38.    The 1997 Federal Budget Act created the State Children's Health Insurance Program, Title XXI, to cover additional children who were uninsured with family income up to 200% of federal poverty guidelines.    42 U.S.C. § 1397aa.    The Oklahoma S-CHIP eligibility is targeted at children who have no creditable insurance; whose family income is below 185% of federal poverty guidelines; who are under 18 years of age; and who were not eligible for Title XIX prior to November 1997.  In its FFY 1999 evaluation of its S-CHIP program, Oklahoma reported to HCFA that 124,123 children were uninsured and eligible for Medical Assistance but were not enrolled.  The S-CHIP program is a capped program with funds allotted to each state.  For FFY 1998, Oklahoma's federal funding allotment was $85,700,000; its federal share of expenditures was only $4,920,675.  In FFY 1999, Oklahoma again failed to maximize available federal funding for health services accessing only $15,641,269 of federal funds.  FFY 2000 allotment of federal funding available to pay over three-fourths of Oklahoma's expenditures was $76,764,895.  65 Fed. Reg. 33,643 (5/24/00).  On January 22, 2001, HCFA announced Oklahoma's S-CHIP allotment for FFY 2001 is $69,088,406.  66 Fed. Reg. 6,631 (1/22/00).

39.    In Oklahoma, the eligibility standards for the children's health care entitlement, varying by size of family and family income, are as follows:

Class Action Complaint                                                      Page 32

| Size of Family | Monthly Gross Income | Annual Gross Income |
|---|---|---|
| 1 | $1,288 | $15,456 |
| 2 | $1,735 | $20,820 |
| 3 | $2,182 | $26,184 |
| 4 | $2,629 | $31,548 |
| 5 | $3,076 | $36,912 |
| 6 | $3,523 | $42,276 |
| 7 | $3,970 | $47,640 |
| 8 | $4,417 | $53,004 |

40.    In addition, children receiving Supplemental Security Income, 42 U.S.C. § 1382 (based upon disability); Adoption Assistance, 42 U.S.C. § 670; and Foster Care, 42 U.S.C. § 670, are, categorically, eligible for Title XIX children's health care.

41.    During the year ending September 30, 1999, the last full year for which data is available, an unduplicated count of 327,789 Oklahoma children were determined to be eligible for Title XIX children's health care **and** enrolled therein by defendants or their agents. This was approximately 37% of Oklahoma's children.

42.    During September 2000, approximately 280,000 children were enrolled in Title XIX children's health care. OHCA has estimated as many as 120,000 additional children are eligible but not enrolled in Oklahoma's Medical Assistance program.

43.    In Oklahoma, in partial accordance with the American Academy of Pediatrics' "Recommendations for Preventive Pediatric Health Care," six **comprehensive medical screening examinations** are to be furnished in an infant's first year of life, beginning within one month after birth and at the second, fourth, sixth, ninth, and twelfth months; two in the second year; one yearly, at ages 2 through 5 years; and biannually, at ages 6 through 20 years

as follows:

    a.    By one month; and

    b.    At 2 months, 4 months, 6 months, 9 months, 12 months, 15 months, and 18 months; and,

    c.    At 2 years, 3 years, 4 years and 5 years; and,

    d.    At 6 years, 8 years, 10 years, 12 years, 14 years, 16 years, 18 years, and 20 years.

The American Academy of Pediatrics' Committee on Practice and Ambulatory Medicine has called for a comprehensive medical examination **each year** for ages 6 through 20. Although OHCA screening regulations purport to have adopted the recommendations of the American Academy of Pediatrics, OHCA 317:30-3-48, defendants have not consulted with the Oklahoma Chapter of the American Academy of Pediatrics, who are plaintiffs herein, or changed their periodicity table. 42 U.S.C. § 1396d(r)(1). See also ¶ 35 *supra*.

44. In Oklahoma, vision examinations and treatment are required every 12 months. OHCA 317:30-5-52.

45. In Oklahoma, dental examinations, including preventive care, are required every 12 months. OHCA 317: 30-3-53; 317:30-5-2(6). In Oklahoma, hearing evaluations are required every 12 months. OHCA 317:30-3-54.

46. Title XIX has long required that the "payments for care and services" must be "consistent with efficiency, economy, and quality." In 1989, Congress codified a long-standing regulation into Title XIX, requiring also that each participating state:

> provide such methods and procedures relating to . . . payment
> for care and services . . . as may be necessary . . . to assure that
> payments . . . are sufficient to enlist enough providers so that
> care and services are available . . . at least to the extent that such
> care and services are available to the general population in the
> geographic area.

42 U.S.C. § 1396a(a)(30(A).  This last requirement is sometimes called the "equal access"

requirement.

47.    Section 1396a(a)(30)(A) was so amended because "Medicaid participation of

physicians generally, and obstetricians and pediatricians in particular, is inadequate;"

because, as the National Governors Association testified,

> There is no doubt that Medicaid reimbursement rates have not
> kept pace with average community rates.  States have restrained
> physician fees as one method of controlling costs.

and, in particular, because:

> In the view of the Committee, the Medicaid eligibility
> expansions for poor pregnant women and poor children will not
> have their intended effect if physicians are not willing to treat
> Medicaid patients.  The Committee recognizes that payment
> levels are only one determinant of physician participation.
> However, the Committee believes that, without adequate
> payment levels, it is simply unrealistic to expect physicians to
> participate in the program.

H.R. Rep. No. 101-247 at 389, 390; 1989 U.S.C.C.A.N. at 2115, 2116.  Under the 1989

Amendment to § 1396a(a)(30)(A), the House Committee which formulated it wrote, "The

question is whether Medicaid beneficiaries have access to provider services at least as great

as that of others in the area who have third party coverage."  H.R. Rep. No.101-247 at 391;

1989 U.S.C.C.A.N. 2060, 2115-17 at 2117.  "[C]ompare the access of beneficiaries," the

Committee instructed, "with the access of other individuals in the same geographic areas with private or public insurance coverage." *Id.* at 390; 1989 U.S.C.C.A.N. at 2116.

48.     The criteria for sufficiency of payments set forth in HCFA Title XIX guidance and cited by federal courts provides that the state rates "must be reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers." *Clark v. Kizer,* 758 F. Supp. 572, 576-578 (E.D. Cal. 1990), *affirmed in part in an opinion not published,* 967 F.2d 585 (9th Cir. 1992), *explained sub.nom. Clark v. Coye*, 60 F.3d 600, 602-03 (9th Cir. 1995). *See also, Arkansas Medical Society v. Reynolds,* 819 F.Supp. 816 (E.D. Ark. 1993), *affirmed,* 6 F.3d 519 (8th Cir. 1993).

49.     In 1989, the House Committee which formulated both the eligibility and the service expansions for children's health care said clearly:

> The Committee notes that Medicaid-eligible children are entitled to EPSDT benefits even if they are enrolled in a health maintenance organization, prepaid health plan, or other managed care provider. The Committee expects that States will not contract with a managed care provider unless the provider demonstrates that it has the capacity (whether through its own employees or by contract) to deliver the full array of items and services contained in the EPSDT benefit. The Committee further expects that, in setting payment rates for managed care providers, the States will make available the resources necessary to conduct the required screenings and to provide the required services.

H.R. Rep. No. 101-247 at 400; 1989 U.S.C.C.A.N. at 2126.

50.     By 1997, it had become clear that managed care was not delivering to enrolled children what Title XIX requires and that states were not enforcing managed care's

Class Action Complaint                                                    Page 36

obligations. *See, e.g.*, U.S. Dept. of H.H.S., Office of Inspector General, Medicaid Managed

Care and EPSDT (May 1997); Children's Dental Services Under Medicaid: Access and

Utilization (April 1996). Congress amended Title XIX, therefore, explicitly to require that:

> Each medicaid managed care organization shall provide the
> State and the Secretary with adequate assurances . . . that the
> organization . . . has the capacity to serve the expected
> enrollment in [its] service area, including assurances that the
> organization–
>         (A) offers an appropriate range of services and
> access to preventive and primacy care services for the
> population expected to be enrolled in such service area, and
>         (B) maintains a sufficient number, mix and
> geographic distribution of providers of services.

42 U.S.C. § 1396u-2(b)(5).

51.     The 1997 Amendments to Title XIX require, also, at § 1396u-2(c)(1), that the

State establish quality assurance standards for managed care and a strategy for assessment

and improvement of its delivery:

> If a State provides for contracts with medicaid managed care
> organizations . . ., the State shall develop and implement a
> quality assessment and improvement strategy [which] shall
> include the following:
>
>         (i) Standards for access to care so that covered services
> are available within reasonable time frames and in a manner that
> ensures continuity of care and adequate primary care and
> specialized services capacity . . . .
>
>         (iii) Procedures for monitoring and evaluating the quality
> and appropriateness of care and services to enrollees that reflect
> the full spectrum of populations enrolled under the contract . . . .
>
>         (iv) Regular, periodic examinations of the scope and
> content of the strategy.

and, at § 1396u-2(c)(2), that the State secure an external, publicly reported, independent

review of the performance of each managed care organization:

> (i) Each contract . . .with a managed care organization shall provide for an annual . . .external independent review conducted by a qualified independent entity of the quality outcomes and timelines of, and access to, the items and services for which the organization is responsible under the contract.

> (iv) The results of each external independent review shall be available to participating health care providers, enrollees, and potential enrollees of the organization . . . .

and, at § 1396u-2(e), that the State establish and use sanctions to enforce the requirements

of Title XIX upon managed care organizations:

> (1) A State may not enter into or renew a contract [with a managed care organization] unless the State has established intermediate sanctions which may include [civil money penalties, the appointment of temporary management, permitting individuals to terminate enrollment, suspension or default of all enrollment, suspension of payment] which the State may impose against a medicaid managed care organization with such a contract, if the organization—

>> (i) fails substantially to provide medically necessary items and services that are required . . . to be provided to an enrollee covered under the contract . . . .

> (3) In the case of a medicaid managed care organization which has repeatedly failed to meet the requirements . . . , the State shall . . . impose the sanctions [of appointment of temporary management and permitting individuals to terminate enrollment.]

> (4) In the case of a managed care entity which has failed to meet the requirements of this part or a contract . . . , the State shall have the authority to terminate such contract [after hearing] and

to enroll such entity's enrollees with other managed care entities (or to permit such enrollees to receive medical assistance . . . other than through a managed care entity).   (Emphasis added)

52.    "In order to assess the effectiveness of State Early and Periodic Screening, Diagnosis and Treatment programs in reaching eligible children" (H.R. Rep. No. 110-247 at 400; 1989 U.S.C.C.A.N. at 2126), Title XIX requires the State to report the number of children provided comprehensive screening examinations, the number referred for treatment, the number receiving dental treatment and "the State's results in attaining the participation goals set for the State under § 1396d(r)." 42 U.S.C. § 1396a(a)(43)(D).

53.    In 1990, under § 1396d(r), two participation goals were set, both to be met in or before FY 1995:  (1) of those children due for one or more comprehensive screening examinations during each fiscal year, 80% of the children will have received at least one; and (2) of the total number of comprehensive screening examinations due to be furnished in each fiscal year, 80% of the total number of examinations will have been furnished.  These goals have been reiterated for each subsequent fiscal year.  HCFA, State Medicaid Manual, Part V Section 5360.  In FY 1995, seven states achieved the first goal: Louisiana, Maryland, Massachusetts, Montana, New Hampshire, Utah and Virginia.  Oklahoma did not (27% in 1995), nor has it since.  In 1995, the second goal was achieved by eight states: Arizona, Hawaii, Illinois, Massachusetts, Montana, Nevada, Utah and Virginia.  Oklahoma did not (23% in 1995), nor has it since.  See Paragraph 56 *infra*.

54.    In order to assure the enrollment of each eligible child and the actual delivery to each enrolled child of the children's health care required by Title XIX, Title XIX also

requires that a State:

A.      Aggressively and effectively inform children and families both of their eligibility and of the health care services to which they are entitled, and arrange for the prompt and continuing provision of all needed children's health care and services.  42 U.S.C. §§ 1396a(a)(8), 1396 a(a)(19),1396a(a)(43); 42 C.F.R. § 441.62; State Medicaid Manual, Part V § 5122;

B.      Establish and utilize cooperative arrangements with other child-serving agencies that are in contact with large numbers of eligible and enrolled children—including early intervention, early education, Head Start, pre-school, kindergarten, elementary schools, secondary schools, public housing, maternal and child health programs, the Special Supplemental Food Program for Women, Infants and Children (WIC), social services, and vocational rehabilitation—to achieve the enrollment of all eligible children and to accomplish the delivery of all required children's health care and services.   42 U.S.C. §§ 1394a(a)(8), 1396a(a)(11); 42 C.F.R. § 441.61(c); HCFA State Medicaid Manual Part V § 5230.

C.      Use presumptive eligibility, the extension and maintenance of eligibility, and simplified applications, enrollment and re-enrollment procedures and provide for receipt and initial approval of medical assistance applications at locations other than those used for public assistance or TANF applications, including at disproportionate share hospitals and federally qualified health centers.  42 U.S.C. §§ 1396a(a)(55), 1396r-1a, 1396r-8, 1396u-1;

D.      Provide to children and families, or arrange for, transportation and

scheduling for the delivery of children's health care.  42 U.S.C. § 1396a(a)(43)(9b); 42

C.F.R. § 441.62.

55.    In short, the obligation imposed upon responsible state officials by Title XIX

of the Social Security Act is, as stated in one of the earliest of the long and consistent line of

federal court cases enforcing Title XIX, to wit:

> The mandatory obligation upon each participating state to aggressively notify, seek out and screen persons under 21 in order to detect health problems and to pursue those problems with the needed treatment is made unambiguously clear by the 1967 act and by the interpretive regulations and guidelines.
>
> [A] somewhat casual approach to EPSDT hardly conforms to the aggressive search for and early detection of child health problems envisaged by Congress.  It is difficult enough to activate the average affluent adult to seek medical assistance until he is virtually laid low.  It is utterly beyond belief to expect that children of needy parents will volunteer themselves or that their parents will voluntarily deliver them to the providers of health services for early medical screenings and diagnosis.  By the time the child is brought for treatment it may too often be on a stretcher.  This is hardly the goal of 'early and periodic screening and diagnosis.'  EPSDT programs must be brought to the recipients; the recipients will not ordinarily go to programs until it is too late to accomplish the congressional purpose. (emphasis supplied).

*Stanton v. Bond,* 504 F.2d 1246, 1250-51 (7th Cir. 1974), *certiorari denied,* 420 U.S. 984

(1975).  *See also, Bond v. Stanton,* 655 F.2d 766, 768 and 771 (7th Cir. 1981), *certiorari*

*denied*, 454 U.S. 1063 (1981); *Mitchell v. Johnston,* 701 F.2d 337, 346-48 (5th Cir. 1983);

*Salazar v. District of Columbia,* 954 F. Supp. 278, 304 (D.D.C. 1996).

## V.

## OKLAHOMA'S NON-PERFORMANCE, DEFENDANTS' VIOLATION AND PLAINTIFFS' CLAIMS

### Count I: Non-Delivery of Care and Services

56.     Defendants have not furnished Title XIX children's health care even to all the enrolled Oklahoma children, let alone to all those eligible but still not enrolled, in violation of 42 U.S.C. §§ 1396a(a)8, 1396d(a)(4)B and § 1396d(r), in that:

A.      The facts set forth in paragraphs 1-55 are incorporated herein as if fully set forth.

B.      The percentage of enrolled Oklahoma children due for one or more comprehensive screening examinations during succeeding years ending September 30, 1999, who were furnished at least one has been:

> FY 1994: 33% of the enrolled children
> FY 1995: 27% of the enrolled children
> FY 1997: 35% of the enrolled children
> FY 1998: 40% of the enrolled children
> FY 1999: 33% of the enrolled children

(Source for this and subsequent paragraphs: Oklahoma's Annual EPSDT Reports, HCFA Form 416, prepared and filed by defendants themselves, their predecessors, or their managing agents.)

C.      The percentage of the total number of comprehensive screening examinations due during succeeding years which were actually delivered has been:

> FY 1994: 29% of the total number of examinations required

FY 1995:  23% of the total number of examinations required
FY 1996:  29% of the total number of examinations required
FY 1997:  34% of the total number of examinations required
FY 1998:  40% of the total number of examinations required
FY 1999:  52% of the total number of examinations required

D.     Put another way, in the year ending September 30, 1999, 67% (two-thirds) of the Oklahoma children who were enrolled in Medical Assistance and were due for at least one comprehensive screening examination **did not receive any**.  Of these:

(i)     14,194 were infants who **did not receive even one** of the six comprehensive screening examinations required by Oklahoma during infancy;

(ii)     60,566 were toddlers (ages one through five) who **did not receive even one** of the required comprehensive screening examinations;

(iii)     28,509 were children of early school age and in their early teens, ages 6 through 14, who did not receive any; and

(iv)     15,458 were young people ages 15 through 20, who did not receive any.

E.     Oklahoma's record for preventive dental care, which is required every 12 months under Oklahoma's periodicity table, is poorer still.  Only about 10% or less of the enrolled children who should have been furnished an evaluation and preventive dental care received any, to wit:

FY 1995:  06% received required evaluation and preventive dental care
FY 1997:  09% received required evaluation and preventive dental care
FY 1998:  10% received required evaluation and preventive dental care
FY 1999:  10% received required evaluation and preventive dental care

F.     The access to pediadontists for children receiving Medical Assistance is nonexistent.  In the metropolitan Tulsa area, only four dentists, none of whom are pediadontists, will treat children receiving SoonerCare Plus.  Children living in rural counties face similar issues.  For example, Stillwater, a SoonerCare Choice county, has only one dentist willing to accept new Medical Assistance patients.  The number of dentists participating in the Title XIX program has gone from a high of 1,121 dental providers in 1987 to a low of 171 in 1998.  The OHCA SFY 2000 Annual Report reflects the number of dentists contracting to provide dental care to Oklahoma's children eligible for Medical Assistance decreased again in SFY 2000.  Children needing emergency dental treatment, as well as preventive care, are not receiving federally mandated dental services because of the lack of dental providers.

58.     Because of defendants' derelictions, omissions, and failures to assure federally mandated health care is provided, Oklahoma children have needlessly suffered and their medical conditions have grown worse.  Children who otherwise could be singing and soaring in school have been distracted and deterred and their learning has been inhibited and even destroyed by such untreated conditions as recurrent otitis media, constant dental pain, asthma, uncorrected vision defects, and auditory disabilities.  With more than 40% of Oklahoma's children eligible for Medical Assistance, the low compensation rates are beginning to impact the availability of quality pediatric care for all Oklahoma children.  Only one pediatric resident in Tulsa's OU medical program chose to practice in Oklahoma upon graduation last May.  The State's ability to attract and keep quality physicians can no longer

withstand the lack of adequate compensation paid to physicians treating Oklahoma's children.

### Count II: Managed Care

59.    In their design, implementation, oversight and enforcement of their contracts with managed care organizations and otherwise, defendants have not secured either the capacity to deliver the full array of items and services required to be furnished to children, or the actual, prompt and complete delivery of children's health care by managed care organizations, in violation of 42 U.S.C. §§ 1396a(a)(8), 1396d(a)(4)(B), 1396d(r), and 1396u-2, including 1396u-2 (a)(5)(C)(iii), (b)(5)(C) and (e), in that:

A.    The facts set forth in paragraphs 1-58 are incorporated herein as if fully set forth.

B.    The 1997 Annual Review by Oklahoma Foundation for Medical Quality of five SoonerCare health maintenance organizations (HMOs) with whom defendants' contract to deliver children's health care shows severe non-performance by HMOs and, *a fortiorari*, by defendants in the delivery of immunizations, as follows:

(i)    The delivery rates of four HMOs for Diphtheria-Tetanus-Pertussis vaccinations to children two years of age ranged from 39.4% to 44%; that of the fifth, calculated with a confidence interval, was between a lower limit of 31.2% and an upper limit of 57%—all far from defendants' 90% "benchmark compliance rate."

(ii)    The delivery rates of four HMOs for polio vaccinations for children before their second birthday ranged from 54.8% to 57%; that of the fifth HMO was

between 47.8% and 73.6%.

(iii)    For Measles-Mumps-Rubella (MMR) immunization before the second birthday, delivery rates of four HMOs ranged from 55.5% to 66.1%; that of the fifth HMO was between 49.5% and 75.1%.

(iv)    For H influenza type b (Hib) vaccinations, delivery rates of four HMOs ranged from 69.5% to 81.1%; that of the fifth HMO was between 65.9% and 88.1%.

(v)    For Hepatitis B vaccinations, delivery rates of four HMOs ranged from 32.8% to 41.1%; that of the fifth HMO was between 26.4% and 52.2%.

(vi)    For varicella zoster immunizations, delivery rates of four HMOs ranged from 0.8% to 2.1%; that of fifth HMO was between 0.0% and 12.4%.

(vii)    For overall immunization, *i.e.,* those children who received all of the immunizations recommended for two-year-olds, delivery rates of four HMOs ranged from 21.9% to 31.3%; that of the fifth HMO ranged between a lower limit of 18.9% and an upper limit of 43.3%.

C.    The Governor's Task Force on Early Childhood Development reported in January 2001 one out of every five two-year-olds in Oklahoma has not received all the necessary immunizations. "Quality health care for young children requires <u>completion of basic immunizations</u> to prevent illness, disease and medical problems." *Id.* at 43 (emphasis original).

D.    The 1997 Annual Review shows severe non-performance also in the delivery of comprehensive screening examinations, as follows:

(i)     The proportion of children who received an age-appropriate screening examination from the five SoonerCare HMOs (the "unadjusted screening rates") ranged from a low of 13% to a high of 24.2%.

(ii)    Even the "adjusted screening rates"—which counted a comprehensive screening examination as actually delivered to a child whenever two attempts to contact the family to schedule an appointment were made or a screening examination was refused—ranged from a low of 17.7% to a high of 28.6%.

(iii)   Even as to these, the 1997 Report (p.19) acknowledges that most of these screening examinations were **incomplete**, counted by a 'partial review of systems,' and most resulted from the child visiting his physician for a particular illness or disorder, not from a scheduled preventive health care visit. The Report says:

> As a result of these factors, bias was introduced into the study in two ways. First, the EPSDT screening rates are inflated because the individuals, in reality, did not receive an actual EPSDT screen. The true rates of EPSDT screenings, already low, would be even lower than those reported here. Secondly, no strict criteria were delivered about what constituted a 'partial review of system.' Without well-defined criteria, the opportunity exists for subjective judgments by the . . . reviewers.

E.     The Legislature created the Oklahoma Health Care Authority in 1994 as "a politically insulated, technically competent mechanism" to implement the Oklahoma Family Choice Health Plan, a general medical care reform proposal. Instead, the Authority started by moving urban Medicaid beneficiaries and then the rural poor on Medicaid into managed care. "Report of the Ad Hoc Committee on the Oklahoma Health Care Authority

Class Action Complaint                                                      Page 47

and SoonerCare," J. Okla. State Medical Assoc., Vol. 90, No. 5 at 195 ( May-June 1997).

F.      Since 1994, defendants have considerably expanded their use of

managed care. In 1996, 19.37% of medical assistance recipients (children and adults) were

in managed care; by 1997, 50.97%; in 1998, 49.69%; and in 1999, 50.05%. (Source: U.S.

Dept. HHS, HCFA, Yearly Tables of Medicaid Managed Care Enrollment.) As the OHCA

has expanded SoonerCare Plus, continuity of care has been severely disrupted for children.

Defendants, under a duty to encourage and support permanent physician relationships to

assure comprehensive care for children receiving medical assistance, instead continuously

disrupt services. Children are randomly assigned to different physicians, without regard to

the medical needs of the child and often without notice to the family, disrupting longstanding

relationships with pediatricians. In 1997, 85% of Medicaid recipients in managed care did

not **choose** a primary care provider but instead were assigned one by SoonerCare. One Tulsa

elementary school participating as a school-based provider could identify primary care

physicians for less than 20 of its 240 children enrolled in SoonerCare. Continuity of

physician care is important to quality of care in children. In a recent study of 47,000 children

around the age of five, the University of Washington found that children who fail to see the

same physician were 60% more likely to visit emergency rooms and 54% more likely to be

hospitalized.

G.      Infant mortality rates in Oklahoma are rising. In 1997, for every 1,000

infants born alive in Oklahoma, 6.6 infants died in their first twelve months. In 1998, for

every 1000 infants born alive, 8.5 infants died during their first year of life. *See* Governor's

Task Force on Early Childhood Development at 42.  In Oklahoma, 7 of every 10 infants who die in their first month are low-weight babies.  During 1999, the percentage of Oklahoma babies born too small (weighing less than 5-1/2 pounds) continued to increase.  Oklahoma Institute for Child Advocacy, State Benchmarks, 1999.  Oklahoma's rate of low birth weight babies in 1999, 6.9% of all births, was higher in 1999 than in the mid-1980s and exceeded the national average.  The low birth weight rate for African-American infants in the state in 1999 stood at a staggering 12.4% of black births.  *Id*.  The lack of early prenatal care is widely accepted as a significant contributing factor to birth weights.  In 1999, only 62% of mothers received recommended levels of early prenatal care.

H.    In the face of rising infant mortality and following enactment of H.B. 2019, the defendants lowered the rates physicians are paid for seeing newborn infants in hospitals.  Fees for initial care of newborns, attendance at births, and discharge day care were all lowered.  Initial care of newborns, HCPCS code 99431, was reduced more than 25% from $68.20 to $49.43.  Rates paid for EPSDT screening of infants have also been reduced.  *See* ¶ 60, *infra*.  Infants at high risk for respiratory syncytial virus are being denied palivizumab therapy by one of OHCA's contracted managed care organizations, even though ordered by their physician and clearly meeting the AAP guidelines.

I.    Access to pediatricians and subspecialists grows more limited by the day.  Physicians, faced with totally inadequate payments which fail to cover costs, restrict the number of children they will see, cease accepting new patients or discontinue services altogether to the approximately 400,000 children in Oklahoma covered by federally

mandated health benefits.   Children whose standard of care calls for treatment by a pediatrician or subspecialist are denied access to needed care, resulting in needless suffering and harm to children.   The lack of specialty care availability denies children needed treatment and increases the difficulties of primary care physicians treating children -- placing physicians in untenable positions of providing care beyond their level of training and expertise; having to beg specialists to see children; and sending children to emergency rooms where hospitals under federal mandates are required to arrange for needed care and treatment.   The scope of these problems is illustrated by lack of pediatric specialty care for SoonerCare Heartland patients in northeastern Oklahoma.   Currently, there are no orthopedic surgeons available, general or pediatric; no pediatric neurologists; no pediatric surgeons; no pediatric hematologist-oncologists; no psychiatrists; one allergy-immunology physician in Broken Arrow; and, while two otolaryngologists are supposedly available, only one performs surgery, including procedures such as tubes.   The lack of access to specialty care is well known to defendants; yet they have failed to take the steps needed to correct the deficiency, while they have continued to expand the number of children covered by the SoonerCare program.

       J.      The Oklahoma Council Public Affairs, in the report, Has SoonerCare Achieved Its Objectives?   A Five Year Checkup (December 2000), finds "Recent trends make it very difficult to claim that SoonerCare has increased access to care.   Indeed, the program may be reducing access to the point that the health care of many low income Oklahomans may be harmed."   In addition:

(i)     At the time of SoonerCare's creation, 70 of the state's 77 counties, which held more that half the Medicaid population, were rural and nearly three out of every four Oklahomans lived in a Health Professional Shortage Area or Medically Underserved Area.

(ii)     Initially there were five HMOs contracting with OHCA: four HMOs operated in Oklahoma City; four in Tulsa; and, three in Lawton. Currently, the Tulsa and Lawton areas have only two HMOs; and Oklahoma City has three serving the same populations.

(iii)     Between 1993 and 1998, average Medicaid expenditures for all services declined in Oklahoma by 3.46%, from $153.07 to $147.77, compared to an average national increase of 4.57%. Payments for primary care physicians' services declined by 21.69% in the fee-for-service program, from $32.55 to $25.49, compared to an average national increase of 17.44%. Only one state had a larger decline than Oklahoma did. In addition, payments for obstetric care in Oklahoma remained unchanged at $736.18, compared to an average national increase of 7.46%. S. Norton, "Recent Trends in Medicaid Physician Fees," Urban Institute, September 1999, Table 3.

(iv)     Between 1992 and 1998, average medical assistance spending per child for early screening and treatment declined from $91.11 to $84.50—an average annual decline of 1.2%, a total decline of 7.2%. B. Crow and Wm. Scott "Comparative Data Report on Medicaid: A Report Submitted to the Fiscal Affairs and Governmental Operations Committee," at 100, Southern Legislative Conference, Council of State Governments

Class Action Complaint                                                    Page 51

(October 1999). Medicaid payments for children grew by 1.58% between 1992 and 2000 but

administrative costs grew by 53.5 percent. *Id.* at xxvii.

> (v)    The December 2000 Report of the Oklahoma Council of Public

Affairs finds:

> Thus it seems very clear that while Oklahoma has been very
> successful in holding down Medicaid costs, it is not because
> SoonerCare is well managed. Medicaid costs have remained
> low because the state has been significantly underpaying
> providers—at least in comparison with other states.

> (vi)    Illustratively:

> This trend can be seen in Oklahoma in a recent debate over
> dentists' reimbursement under SoonerCare. Dentists providing
> care for up to 77,000 patients complained that they were not
> getting enough money under their capitated contract. State
> Senator Angela Monson responded that the money went to the
> health care authority, as it was supposed to. The health care
> authority argued that it does not set rates in the HMO contract.
> And the HMO argued that the dentists agreed to the rates. Thus,
> dentists are bearing all of the risk but not much money, yet only
> one seems willing to accept responsibility for the problem.

> (vii)    And the Council's Report concludes:

> As a result, more and more MCOs are canceling their contracts
> and dropping out of the Medicaid program—both in Oklahoma
> and in other states—and it is becoming harder and harder to find
> replacements. In addition, an increasing number of health care
> providers are dropping out of the system or refusing to accept
> new Medicaid patients.

> K.    The Governor's Task Force on Early Childhood Education has prepared

its "Report and Recommendation for Oklahoma's Infants, Toddlers and Preschool Children."

The Report concludes:

> A healthy beginning is critically important to young children's development. Several factors clearly indicate that a large portion of Oklahoma's infants face severe challenges in being born healthy and staying healthy as they begin the first years of life, including: unintended pregnancies, high infant mortality rates, lack of adequate prenatal care, high teen birth rate, large numbers of children without any health insurance, poor rates of pediatricians accepting Medicaid, and low rates of immunizations.

### Count III: Sufficiency of Payments

60.     Defendants have neither provided nor assured that payments to pediatric providers of care and services are consistent with the preventive purposes of the program (efficiency), or with the timely delivery of preventive care and the avoidance of avoidable high cost chronic conditions and crisis care in higher cost environments (economy), or with quality, or that payments to pediatric and specialty providers of care and services are sufficient to enlist enough providers so that children's health care and services are available to children enrolled in Medical Assistance, at least to the extent that such care and services are available to the general population in the geographic area who have private or public insurance coverage, in violation of 42 U.S.C. § 1396a(a)(30); 45 C.F.R. § 447.204, in that:

A.     The facts set out in paragraphs 1 through 59, above, are incorporated here as if fully set forth.

B.     In 1992, payments to Title XIX providers were reduced across the board 5%. Not until H.B. 2019 passed in 2000 were the rates for pediatricians or other specialists reviewed, evaluated or adjusted.

C.     In 2000, the Oklahoma legislature increased funding for Title XIX by

18%.   This funding increase resulted in some payment codes increasing while others decreased.   Despite the additional funding to OHCA, payment for EPSDT screenings decreased for most Oklahoma children.   Pursuant to Oklahoma's State Medicaid Plan's Methods and Standards for Establishing Payment Rates-Pediatric Services, prior to July 2000, all EPSDT Child Health Screenings were billed under code W3011 and the rate was $68.20.   Oklahoma State Medicaid Plan, Attachment 4.19-B at 25d, 07-01-96.   Following the increase in OHCA funding, pediatricians were notified by Defendant Fogarty in a letter dated August 10, 2000, OHCA-2000-38, that billing for EPSDT examinations would be changed to Current Procedure Terminology codes for preventive care.   Despite the increased funding made available by the legislature and signed by Governor Keating, the rates received by pediatricians for most EPSDT exams were lowered.   The following chart reflects the change in reimbursement rates for EPSDT screening following passage of H.B. 2019.

Class Action Complaint                                                      Page 54

| HCPCS billing codes for EPSDT screening 7-1-00 | Description of current billing codes for EPSDT screenings | Pre-HB2019 OHCA rates,[4] EPSDT screening all patients W3011 | Post-HB2019 OHCA rates,[5] new patient EPSDT screening | Post-HB2019 OHCA rates,[6] established patient EPSDT screening |
|---|---|---|---|---|
| 99381&91 | Preventive visit, infant | 68.20 | 62.58 | 51.07 |
| 99382&92 | Preventive visit, ages 1-4 | 68.20 | 67.97 | 57.04 |
| 99383&93 | Preventive visit, ages 5-11 | 68.20 | 67.51 | 56.81 |
| 99384&94 | Preventive visit, ages 12-17 | 68.20 | 75.12 | 64.30 |
| 99385&95 | Preventive visit, ages 18-21 | 68.20 | 72.83 | 62.70 |

The only EPSDT screening rates that increased are those rates paid for new patients ages 12 to 21. These increases amounted to less than 12% and cover children who, under Oklahoma's periodicity schedule, receive the fewest screenings.

    D.    Newborn infant care by physicians, likewise, did not see an increase in rates. For example:

---

[4]    Oklahoma Health Care Authority Procedure Based Maximum Allowable Payment at 27 (05/09/00).

[5]    Oklahoma Health Care Authority Procedure Based Maximum Allowable Payment at 102 (08/30/00).

[6]    Oklahoma Health Care Authority Procedure Based Maximum Allowable Payment at 102 (08/30/00).

Class Action Complaint                                                                           Page 55

| HCPCS billing codes | Description of current billing codes for hospital care services | Pre-HB 2019 OHCA rates[7] | Post-HB2019 OHCA rates[8] |
|---|---|---|---|
| 99431 | Initial care, normal newborn | 68.20 | 49.43 |
| 99433 | Normal care, newborn hospital | 17.00 | 26.40 |
| 99435 | Newborn discharge day hospital | 76.24 | 63.36 |
| 99436 | Attendance, birth | 75.45 | 62.90 |

61.     The increased funding in 2000 did not adequately remedy the low reimbursement rates for medical services to children.  In January 2001, the Governor's Task Force acknowledged that low reimbursement rates limit Oklahoma pediatricians' participation in Title XIX funded care for Oklahoma's children.  *Id.* at 42-43.

A.     Seventy-five (75%) of Oklahoma pediatricians who practice in private offices report that Title XIX Medical Assistance payments do not cover costs.

B.     While forty-eight percent (48%) of Oklahoma pediatricians accept all Medical Assistance children who present themselves as patients, this is one of the **lowest** percentages among the fifty states and nineteen percentage points below the United States average.  In contrast, sixty-seven (67%) of Oklahoma pediatricians accept all privately insured patients who present themselves.

C.     Seventy-five percent (75%) of Oklahoma pediatricians rate low

---

[7]     Oklahoma Health Care Authority Procedure Based Maximum Allowable Payment at 102 (05/09/00).

[8]     Oklahoma Health Care Authority Procedure Based Maximum Allowable Payment at 102 (08/30/00).

reimbursement as very important in their decision to limit participation in medical assistance. Fifty-six and seven tenths percent (56.7%) rate "increasing state managed care requirements" as very important; forty-nine percent (49%) rate paperwork concerns as very important.

     D.    Forty-one and seven-tenths percent (41.7%) of pediatricians in Oklahoma would see more medical assistance patients if fees were increased. This is the third **highest** percentage among the fifty states.

     63.    Because state reimbursement to pediatricians and specialty care providers are set too low, needed medical services are unavailable and children are routinely left without federally mandated medical care and services. The recent increase from the unduplicated count of 327,768 children enrolled during the year ending September 30, 1999 to some 393,110 children now enrolled, as reported by defendants in their November 29, 2000 press conference, will, without a concomitant improvement in the number and capacity of Medical Assistance providers to deliver health care and services, extend Oklahoma's unlawful non-delivery to even more children and render this non-delivery even more stark.

     64.    The low reimbursement rates are adversely affecting the infrastructure of health care systems available to all of Oklahoma's children. Last year, 19 doctors graduated from OU and OSU's pediatric residency programs. Twelve (12) have chosen to practice in other states. Oklahoma's ability to attract and keep pediatricians and pediatric specialist providers to provide quality care is being impaired by the payment structure and rates of OHCA's Medical Assistance program for children.

### Count IV: Effective Cross-Agency Co-operation Agreements, Outreach, Transportation, Scheduling and Case Management

65.     Paragraphs 1 through 64 are incorporated here as if fully set forth.

66.     Defendants have failed to effectively design, implement and rigorously carry out cross-agency cooperative agreements—such as agreements with schools and pre-school programs attended by eligible and enrolled children to encourage and to track enrollment and the actual delivery of services, *e.g.*, Medical Assistance reports to inform schools at the start of the school year of date(s) of comprehensive screening examinations, thus assuring they have, in fact, been scheduled as required; schools reminding children, tell them how to get needed transportation; Medical Assistance reports to schools that examinations took place and of the scheduled next or new date; the same for public housing and across the child-intensive agencies—so that delivery as well as enrollment and re-enrollment is more surely and more fully achieved, in violation of 42 U.S.C. §§ 1396a(a)(8), 1396d(4)(B),1396 d(r), 1396u-2 and 1396a(a)(11)(A), 42 C.F.R. § 441.61(c), U.S. Dept. HHS, HCFA, State Medicaid Manual, Pt. V, Sec. 5230.

67.     Defendants have failed to aggressively, effectively and systematically inform and engage families and children and assist them in securing delivery of the children's health care to which they are entitled, including failing to design and use simplified enrollment, re-enrollment, extension, maintenance and reporting procedures for recipients and providers alike; failing to provide or to arrange for transportation and scheduling; failing to provide case management and outstations; and failing to fully use presumptive eligibility as required

by Title XIX in order to achieve complete delivery, in violation of 42 U.S.C. §§ 1396a(a)(8),

1396d(4)(B), 1396d(r) (especially (1)(B)(5)), 1396u-2, and § 1396a(a)(19)(43), (53), (55)

and 1396d(a)(19), 1396n(g)(1) and (2).

## VI.  REQUEST FOR RELIEF

WHEREFORE, plaintiff children by their families and next friends, on behalf of

themselves and the class of children they represent, and organization plaintiffs respectfully

request that this Honorable Court grant the following relief:

1.    Determine that this action may be maintained as a class action on behalf of the

class of eligible and enrolled children who have been, are being and in the future will be

denied timely, complete and continuing children's health care under Title XIX.

2.    Declare defendants to have violated the children's health care provision of Title

XIX of the Social Security Act as aforesaid.

3.    Preliminarily and, upon full hearing, permanently enjoin defendants, singly and

jointly:

(a) To promptly furnish to all enrolled and eligible Oklahoma children the

continuing and complete children's health care to which they are entitled;

(b) To provide payments for care and services to: physicians, including

pediatricians, pediatric subspecialists, and specialty care; dental; and mental and behavioral

health providers which are consistent with achievement of the purposes of the children's

health care program, which are economical of children's, families', and professional

resources, which are consistent with the delivery of quality children's health care, and which

are sufficient to enlist enough providers so that care and services are available to enrolled and eligible children at least to the extent that such care and services are available to children in the geographic area who have private or public insurance coverage;

(c) To assure that health management organizations have the capacity, and fully and effectively use it, to deliver to all Oklahoma children enrolled with them the timely, continuing and complete health care to which they are entitled;

(d) To aggressively establish and utilize cooperative arrangements with other child-intensive agencies, to seek out, to inform and to arrange for the delivery of timely, complete and continuing children's health care and services to all enrolled and eligible Oklahoma children, as well as to secure enrollment, re-enrollment, extension, maintenance, presumptive eligibility, and ease of reporting to the children, their families and their providers, and to secure transportation, scheduling and case management; and

(e) To take such actions as are proper and necessary to remedy their past violations.

4.    Award plaintiffs reasonable attorneys' fees and costs, as authorized by 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

5.    Grant such other relief as the Court may judge just and proper.

Class Action Complaint                                                           Page 60

Respectfully submitted,

By: *Patricia W. Bullock*

Patricia W. Bullock, OBA #9569
Louis W. Bullock, OBA #1306
Michael J. Lissau, OBA #18098
Bullock and Bullock
320 South Boston, Suite 718
Tulsa, Oklahoma 74103-3783
Phone: 918-584-2001
Facsimile: 918-582-7302

Thomas K. Gilhool
Public Interest Law Center
  of Philadelphia
125 S. 9th Street, Suite 700
Philadelphia, Pennsylvania 19107
Phone:  215-627-7100

Medicaid.Com